# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of

M.F.

No. 85455-1-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — M.F. appeals the trial court's order for 14 day involuntary treatment, arguing the court erred in taking judicial notice of M.F.'s prior commitment order during the probable cause hearing. Although the court erred by taking judicial notice, because the error did not materially affect the outcome, we affirm.

I

On May 27, 2023, Douglas Almquist was doing yardwork when a woman, later identified as M.F., approached him and claimed she had been raped, abducted, and drugged. Almquist advised her to call the police and returned to his yardwork in the back of the house because "[t]he laundry list of offenses were so extreme [he] didn't think that there was any chance that what she was saying would be true." When he returned to the front of the house a few minutes later, he noticed M.F. was sitting on the front porch of his neighbor's house. Almquist walked over and told M.F. she needed to leave. M.F. stated she wanted to wait for the people who lived in the house to return. Almquist began walking back to his house when he noticed a Seattle Police Department vehicle approaching and waved it over.

Officer Trevor Willenberg instructed M.F. that she was not free to leave. M.F. stated she did not believe they were police officers and that she was not going to stay. Willenberg "had her sit on the ground where she continued to resist and actively tried to leave, at one point trying to bite [his] hand at which point we then placed her in handcuffs and in the recovery position." Willenberg testified that M.F. "was actively trying to get up when we were holding her down. She would also kick at another officer while we were trying to place her in handcuffs. And there were multiple attempts of biting throughout the interaction."

M.F. was transported to the University of Washington Medical Center (UWMC) by ambulance. At UWMC, M.F. was moved to a gurney and placed in restraints without incident. M.F.'s chart notes indicate that she attempted "to bite multiple [medical assistants] and paramedics. Repeatedly calls all healthcare personnel surrounding her ['Murderers'] and cursing at providers." On May 28, 2023 Crystal Long, a designated crisis responder, examined M.F. Long wrote, "[M.F.] suffers from a behavioral health disorder characterized by paranoia, delusions, erratic behavior, impaired judgment, impaired insight" and

> [d]ue to symptoms of a behavioral health disorder, [M.F.] is gravely disabled. She is unable to engage with healthcare providers due to her paranoia and delusions. She declines hospitalization and is not willing to accept medications. She is demonstrating an increasing loss of cognitive and volitional control over her actions and is not receiving such care as is essential for her health and safety.

Based on her observations, Long filed a petition for initial detention. On May 28, 2023, M.F. was admitted to Navos Inpatient Services. M.F. "quickly grew agitated and refused to agree to remain safe to self and others prior to be[ing] released

from the ambulance gurney. [She e]scalated into attempting to bite staff and spit at them[. She was] agitated, hostile, [and] verbally abusive." M.F.'s medical records noted that she "requires medication due to violent and aggressive behavior as evidenced by yelling, slamming the door, verbally abusive, hostile, agitated, posturing, and threatening physical violence against staff in response to redirection." Ultimately, "[u]se of force [was] required in the form of physical hold to administer[] medications." A note dated May 29 documented further objection to treatment by M.F. and, under assessment and plan, reported what "may be a ketones positive 3.6," and a plan to "monitor [basic metabolic panel] weekly and keep this in mind when starting new medications."

On June 2, 2023, Navos petitioned for 14 day involuntary treatment, stating M.F. presented a likelihood of serious harm to others, and was gravely disabled. During a two day probable cause hearing, the court heard testimony from Almquist, Willenberg, Hyemin Song, a records custodian for UWMC, Michelle Bradley, a licensed mental-health counselor for Navos, and M.F.

Song testified to statements in M.F.'s medical chart notes during her stay at UWMC, which were admitted under the business record hearsay exception. M.F.'s counsel maintained objection to "opinions or hearsay" contained within the records. On cross-examination, M.F.'s counsel elicited a statement from the chart notes that it was unlikely antipsychotics would target fixed beliefs. The court allowed that

the entire medical note be read into evidence at the State's request and over M.F.'s objection. The chart note stated that M.F.

> has consistently refused psychotropic medications, but was previously on Haldol Dec[anoate] during hospitalization at Harborview [Medical Center] in April of 2022. But reports lack of benefit during interview today. It is unlikely antipsychotics would target fixed beliefs. But it was noted to have helped both mood stability and increased ability to problem solve, and cope to meet basic needs.

Bradley testified her working diagnosis for M.F. was unspecified psychosis because she "exhibits symptoms of disorganization, agitation, delusions, paranoia, aggression, hyper verbal and tangential speech, restlessness, anxiety and an impairment in her insight judgment and impulse control." Bradley opined the impairment had a substantial adverse effect on M.F.'s cognitive and volitional functions, M.F. presented a substantial risk of physical harm to others, and she was in danger of serious physical harm from a failure or inability to provide for essential needs in health and safety. Bradley testified without objection, "as for [M.F.'s] previous commitment that was brought to our attention, that she has in the past struggled with significant weight loss when she has been in a similar state where she's been so preoccupied with these delusions about her food that she's lost significant weight."

M.F. testified she was walking around Almquist's neighborhood attempting to get help from the public because her "neighbors have involved me in identity theft, burglary. They've stolen funds of over $40,000 or more" and entered her home and applied chemicals to her food and water system so she cannot eat or drink. M.F. testified that when the police came, "[t]hey kneeled on me, they ground

4

my hand into the pavement, and then they pulled my arms forcibly behind my back and cuffed me. They injured both my arms." M.F. stated that when she was in the emergency room, she was not spitting or biting, but admitted to yelling because she did not want medication as it was making her ill. On cross-examination, M.F. testified the chemical spray on her food and water affected her eating "badly" and she was forcing herself to eat the food. She agreed she had lost weight, but testified she thought she gained it back in the facility.

After the State rested, it asked the trial court to take judicial notice of a past commitment order from February 2022, and, according to the report of proceedings, presented the trial court an uncertified copy of the order. M.F. argued the court did not have the authority to take judicial notice of documents from a separate case. This reiterated a motion M.F. had filed before the hearing, in which she relied on Swak v. Department of Labor & Industries, which held, "courts of this state cannot, while trying one cause, take judicial notice of records of other independent and separate judicial proceedings even though they be between the same parties. The record, though public, must be proved." 40 Wn.2d 51, 54, 240 P.2d 560 (1952).

The State argued the court should consider the document it had handed up, asserting RCW 71.05.245 requires the court to give great weight to any evidence before the court regarding whether the person has a recent history of prior violent acts, or a recent history of one of more commitments under the chapter. The State argued the court should grant the document judicial notice because the document had "the clerk's office stamp on it. I am an officer of the court. I'm the prosecutor

who's handled both of these cases. I have provided the Court with a copy of the order that is in the Court's own file."

The court overruled M.F.'s objection to its taking judicial notice, ruling, "The Court finds that this Court's own files cannot reasonably be questioned by this judicial officer being asked to take notice of the fact that this Court, this Superior Court, has an order on file . . . of commitment for this same Respondent." The trial court found that it

> can take judicial notice of the fact that that prior commitment was entered within the three-year time frame. And it is proper that I be given a copy of the order itself, as that is the best-evidence rule, and that it's been stamped by the clerks' office. And I have every reason—every indicia of reliability, that is required under ER 201, to take judicial notice of that item. And, therefore, I will take into account that there is a prior involuntary commitment.

The trial court did not make the document an exhibit or otherwise incorporate it into the record, and as a result it is not before this court. To the extent of our record, the prosecutor described the document as "the past commitment order from February of 2022," and the court described it as "an order of commitment for this same Respondent."

On June 13, 2023, the trial court found by a preponderance of the evidence that M.F. suffered from a behavioral health disorder that had a substantial adverse effect on her cognitive and volitional functioning. The trial court also found by a preponderance of the evidence that M.F. presented a likelihood of serious harm to others, was in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety, and a less restrictive treatment alternative was not appropriate because M.F. was not mentally stable. The trial

6

court based its findings on witness testimony, and took judicial notice of the prior commitment order. The court noted that

> the Court has heard evidence that it is part of the underlying expert opinion of the court evaluator that that prior hold had some patterns that caused them great concern might be repeated. The Court also heard numerous indications from [M.F.] herself, that there has been a prior hold.
> So, I have to take them into account. I'm—it is mandatory under the statute that the Court give great weight, but not sole weight, to the fact that there has been a prior hold.

In the court's oral ruling, the court based its finding of a likelihood of serious harm to others on M.F.'s interactions with police and medical personnel. The court based its finding of inability by M.F. to provide for her essential needs of health and safety on the reported ketones level, loss of weight together with fixation on the possibility of poisoned food, concern for the safety of M.F.'s peripateticism in the city, and refusal of examination due to delusional thinking. The court ordered M.F. into the custody of Navos for inpatient treatment for up to 14 days. M.F. appeals.

II

M.F. argues the trial court erred in taking judicial notice of the prior involuntary commitment order. We agree.

We review judicial notice decisions de novo. <u>Fusato v. Wash. Interscholastic Activities Ass'n</u>, 93 Wn. App. 762, 771-72, 970 P.2d 1316 (1999). A judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy

cannot reasonably be questioned." ER 201(b). In Washington, courts "cannot, while trying one cause, take judicial notice of records of other independent and separate judicial proceedings even though they be between the same parties. The record, though public, must be proved." Swak, 40 Wn.2d at 54. Here, the record was not proved.

The State first argues that judicial notice may be taken of the record of the proceeding currently before the court, or proceedings "engrafted, ancillary, or supplementary to it." Swak, 40 Wn.2d at 53. This has been held to permit judicial notice of a minute entry reflecting the defendant's arraignment earlier in the same criminal case. State v. Scriver, 20 Wn. App. 388, 399, 580 P.2d 265 (1978). But it does not permit judicial notice in one action of "separate judicial proceedings," thus foreclosing judicial notice of an earlier dependency order in post-termination adoption proceedings. In re Adoption of B.T., 150 Wn.2d 409, 415, 78 P.3d 634 (2003). The exception for "engrafted, ancillary, or supplementary" proceedings does not apply here, because the earlier involuntary treatment order was entered in a separate judicial proceeding.

The State next argues that the trial court could take judicial notice of the document because the trial judge examined it, citing, as the trial court did, State v. Duran-Davila, 77 Wn. App. 701, 892 P.2d 1125 (1995). In Duran-Davila, the trial court relied on the judicial notice rule for evidence of the age of an alleged minor in a prosecution for involving a minor in a transaction to sell a controlled substance. Id. at 701. When a hearsay objection was interposed to testimony to establish the person's age, the trial court judge excused the jury and telephoned the juvenile

8

court clerk who reported the person had pleaded guilty to certain offenses as a juvenile. Id. at 703. Taking judicial notice of this information, the court allowed the witness to relay hearsay not subject to an exception from the juvenile court booking sheet. Id. We reversed, because the person's age was "not an appropriate fact for judicial notice," because it did not meet either prong ER 201(b). Id. at 706.

The trial court's ruling and the State point to a comment in Duran-Davila that the trial court erred in taking judicial notice "without having viewed the actual file." Id. at 706 (citing ER 1001 et seq.). The opinion held the trial judge's phone call to the clerk was not a proper means of proving the content of the clerk's papers under ER 1001 and 1002. Id. But Duran-Davila did not hold the problem was only that the trial judge had not looked at the juvenile court booking sheet. The trial court "also" erred by taking judicial notice of the person's age contained in those files because the person's age was neither generally known nor capable of accurate and ready determination by resort to sources of unquestionable accuracy. Id. at 706. Duran-Davila does not support that examination of a document may make a fact it states admissible under ER 201(b) that is not otherwise so.

The State next argues that under RCW 2.28.210 and RCW 71.05.245, the trial court could take judicial notice of a prior hospitalization. Before granting any relief under the involuntary treatment act, Title 71 RCW, a court may consult the judicial information system or any related databases to determine criminal history or the pendency of other proceedings involving the parties. RCW 2.28.210(1)(d). In determining whether there is a likelihood of serious harm during an involuntary commitment hearing, a court must to give great weight to any evidence before the

9

court regarding whether a person has a recent history of one or more violent acts or a recent history of one or more commitments which were based on a likelihood of serious harm. RCW 71.05.245(3). The State asks us to read these statutes together and conclude the trial court "appropriately consulted its own records to confirm that a prior commitment order had been filed within the past three years without taking notice of facts within the separate order itself."

These statutes do not support the trial court's ruling concerning judicial notice. Nothing in the record shows that the trial court consulted the judicial information system or any related database to obtain any information. The record indicates only that the judge examined a document that the prosecutor presented. Additionally, in directing the court to place weight on "any evidence" of recent history of involuntary commitments, RCW 71.05.245(3) does not speak to the manner in which a party must place that history among the "evidence" before the court. Finally, the record does not show that M.F.'s prior commitment was based on a likelihood of serious harm, which is the particular type of commitment to which the court must give great weight under RCW 71.05.245(3). Because the prior commitment order was entered in a proceeding separate from the instant case, the trial court erred in taking judicial notice of it.

Evidence admitted in violation of the rules of evidence is not a reversible error if it is harmless. State v. Ashley, 186 Wn.2d 32, 47, 375 P.3d 673 (2016). Erroneous admission of evidence is harmless unless there is a reasonable probability that, but for the error, the verdict would have been materially different.

Id. Here, there is not a reasonable probability the trial court's decision would have been different absent the error.

The trial court found M.F. presented a likelihood of serious harm to others based on testimony from Almquist, Willenberg, and testimony that while M.F. "was in the hospital, she postured and threatened violence at hospital staff, as well as engaged in spitting and trying to kick treatment providers." The court based its finding on testimony "that the hospital staff applied physical holds multiple times due to the imminent risk of danger presented by [M.F.]." In finding that M.F. was gravely disabled under RCW 71.05.020(25)(a), the trial court cited testimony that M.F. was unable to eat and enjoy food because she feared her food was poisoned and Bradley's testimony that M.F. had experienced significant weight loss in a prior episode due to a fixation of being poisoned. The court also cited M.F.'s inability to provide for her needs of safety, as M.F. refused to have her vitals taken and refused labs, making it difficult for providers to assess her health and safety. Finally, the trial court cited testimony that M.F. experienced significant trauma in the past and had been unable to access help due to her beliefs that police officers were not real or that medical providers were trying to harm her.

Despite its written order attributing "great weight" to the order as the trial court understood RCW 71.05.245 to direct, the trial court did not mention the prior commitment in its oral findings of likelihood of harm to others or grave disability. Furthermore, evidence of M.F.'s prior commitment was introduced independent of the order. Song testified that M.F. was previously hospitalized at Harborview in April 2022. Bradley also testified about M.F.'s previous commitment and how she

struggled with significant weight loss when she was in a similar state. Because the trial court based its findings on sufficient evidence independent of the prior commitment order and there was independent evidence of the prior commitment, there is not a reasonable probability the outcome would have been different absent the error.

Affirmed.

Birk, J.

WE CONCUR:

Smith, C.J.          Mann, J.